UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 11-4293

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GREGORY SYLVESTER TAYLOR, JR., a/k/a Knowledge Born Allah,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.  Roger W. Titus, District Judge.  (8:10-cr-00297-RWT-1)

Argued:  October 26, 2012          Decided:  February 8, 2013

Before NIEMEYER, MOTZ, and DAVIS, Circuit Judges.

Affirmed by unpublished opinion.  Judge Niemeyer wrote the opinion, in which Judge Motz and Judge Davis joined.

**ARGUED:**  Meghan Suzanne Skelton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant.  Adam Kenneth Ake, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.  **ON BRIEF:**  James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant.  Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

After pleading guilty to four counts of bank larceny, in violation of 18 U.S.C. § 2113(a), Gregory Taylor was given a variance sentence of 63 months' imprisonment. He now challenges the sentence, contending (1) that the government breached its plea agreement in telling the district court that Taylor's pretrial conduct qualified for an obstruction of justice enhancement; (2) that the district court erred in finding that an obstruction of justice enhancement was justified; and (3) that the sentence was substantively unreasonable.

For the reasons that follow, we affirm.

I

On December 29, 2009, Gregory Taylor entered a SunTrust bank in Upper Marlboro, Maryland, and handed the teller a demand note stating, "I want all 100's and 50's NOW!" The teller gave Taylor $1,235, and Taylor fled. Taylor used the same modus operandi to obtain $200 from a Chevy Chase bank in District Heights, Maryland, on February 23, 2010; $2,250 from a Wachovia bank in Largo, Maryland, on February 24, 2010; and $500 from a BB&T bank in Temple Hills, Maryland, on April 2, 2010.

After he was indicted and a lawyer in the Federal Public Defender's Office was appointed for him, Taylor refused to cooperate with his counsel. Also, both before and after counsel

2

was appointed, Taylor undertook a campaign to flood the district court with frivolous motions and lawsuits. His motions were laced with terminology evocative of the Uniform Commercial Code ("UCC"), such as his signing the motions "'Without Prejudice' Gregory Sylvester Taylor J©, Authorized Representative d/b/a GREGORY SYLVESTER TAYLOR J©, DEBTOR" and phrases like "I will stipulate to all of the facts and accept and return the same for full settlement and closure in the transaction." Taylor's motions included a motion for an appearance bond or personal recognizance, a motion for return of property, and a motion for dismissal of the indictment. He also filed numerous civil suits in the district court against various governmental bodies and officials such as the police station, the sheriff's department, the district court, and the governor.

Taylor's counsel filed a motion to withdraw as counsel, and on July 23, 2010, the district court held a hearing on the motion, which included consideration of Taylor's wish to represent himself and his competency to waive counsel. At the hearing, when addressing the court, Taylor continued to use UCC-laced terminology, telling the court, "I don't consent to this conversation. . . . I'm here to accept the charges for value and returning for value in exchange for my exemption that the charges be dismissed."

The court told Taylor that it was "very familiar with the various movements that assert these various positions that you're taking" and noted that Taylor had "filed 14 civil suits in this court, all of which have been found to be frivolous and dismissed." The court warned Taylor that "if you are found guilty and the time comes for sentencing, I want you to know that under our sentencing guidelines, if I conclude that you've taken steps to obstruct justice, that that could enhance the amount of sentence you might be recommended for under those guidelines." The court then asked Taylor to directly answer his questions.

When the court resumed asking Taylor whether he wanted to proceed without counsel, Taylor told the court at least four times that he wished to proceed on his own. He then said, "I'm not here to argue the facts of this case. I'm only here to request that the charges be dropped and the bond be released to me at this time." The court replied, "Sir, what you're saying is legal gibberish. It makes no sense whatsoever and it's not effective for what you want to do."

The court again tried to persuade Taylor to accept counsel, emphasizing the seriousness of the charges that Taylor was facing. Taylor again declined counsel and told the court that he wanted to proceed on his own. Taylor then tried to "plead guilty on behalf of the defendant debtor, but that's not me."

4

The court replied that this was "legally nonsensical" and directed the clerk to enter a plea of "not guilty" on Taylor's behalf.

In its subsequent written order, the court granted the Public Defender's motion to withdraw, concluding that Taylor had knowingly, intelligently, and voluntarily waived his right to counsel. The court also appointed standby counsel, over Taylor's objection.

Shortly after the hearing, Taylor requested counsel and the court then reappointed counsel from the Public Defender's Office.

Even after having counsel reappointed, Taylor continued to send the court various pro se motions using UCC terminology, asking, for example, that the case be dismissed because he had "accepted all charges of the DEBTOR/DEFENDANT . . . and have returned them to the above courts for offset" and for a chance to "tender an offer to discharge all old case bonds, bails, or other obligations with an exchange of my exemption."

At the hearing on Taylor's pretrial motions, on December 13, 2010, Taylor's counsel told the court that Taylor might change his plea, but would first like to hear the court's opinions on his various motions. The court complied, telling Taylor that the types of suits and motions he filed "have been classic examples of what . . . [is] referred to at various times

as the 'flesh and blood defense' or the 'sovereign man defense.'" The "flesh and blood" defense, the court explained, is a theory with "origins in some white supremacist groups and essentially attempts to do everything it can to jam the courthouse computers with nonsensical pleadings" and had now unfortunately arisen in a number of cases in the district. The court told Taylor that he was "treat[ing] these nonsensical motions as motions challenging the jurisdiction of this court and . . . I will overrule and deny them."

After Taylor conferred with his lawyer, his lawyer informed the court that Taylor wished to plead guilty. Taylor's counsel told the court that "Mr. Taylor . . . has been adamant that I tell the Court . . . that by filing the motions . . . his intention was merely to avail himself of what he thought were means by which to obtain information, discovery, and . . . other relief." Then Taylor, through counsel, again asked the court for its views on the "flesh and blood" defense. The court told him that the defense "is one that has absolutely no merit" and was "designed to gum up the machinery of the court." Taylor thanked the court, and the court then proceeded with the rearraignment.

Taylor pleaded guilty pursuant to a written plea agreement with the government. Under the agreement, the parties stipulated that the base offense level was 7, pursuant to

6

U.S.S.G. § 2B1.1(a)(1), and that the offense level was to be increased to 9 because the thefts were from the person of another, pursuant to U.S.S.G. § 2B1.1(b)(3). The parties also stipulated that the government "d[id] not oppose" a 2-level reduction for acceptance of responsibility, resulting in a final offense level of 7. Finally, the parties agreed: "[N]o other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines or in 18 U.S.C. § 3552(a) will be raised or are in dispute."

After entering his guilty plea, Taylor again sent the court a letter using the language of the "flesh and blood" defense.

At Taylor's sentencing hearing on March 3, 2011, the district court, after discussing the volume of Taylor's frivolous motions and suits and the efforts they required of the U.S. Attorney's Office and the court, asked the parties whether Taylor's motions and suits warranted an upward adjustment for obstruction of justice. The court heard from defense counsel and then had the following exchange with the Assistant United States Attorney ("AUSA").

> THE COURT: I understand the government has an agreement and is bound by it. But I'm asking you as an officer of the court whether you believe what I've described does or does not constitute obstruction of justice for an enhancement of an offense level.

* * *

7

> AUSA: Certainly with respect to the filings that were submitted after the guilty plea. We would have serious concerns about that . . . given that by that time as I understand it the Public Defenders office was in the case and yet the filings continued. I think as a legal matter the filings do qualify for the obstruction of justice enhancement, but as a contractual matter we are not seeking that and I want to make that clear on the record.

After Taylor's counsel protested that the AUSA was not familiar with the documents, as the AUSA was standing in for the assigned AUSA, the court responded:

> I've directed him as an officer of the Court to give me a legal opinion answer, and he's clearly indicated that he is standing by the plea agreement. He is not in violation of the plea agreement. He's an officer of the court. He's obligated to answer me when I ask him a question.

The court heard additional arguments from Taylor's counsel and then decided to impose the enhancement, explaining:

> [Taylor] may have been misguided, but being misguided is not a defense to this kind of behavior. It's gone on with a number of people. It's a plague that I don't want to help it spread as being almost a sport of sending frivolous documents in . . . it's gotten pretty bad in some cases. Not as bad in this one, but this is clearly a case in which there's been a systematic effort to thwart the prosecution . . . [that resulted in] a considerable amount of effort by staff of this court and by this judge to deal with it.

Accordingly, the court raised Taylor's offense level 2 levels, to 9, which, with a criminal history Category III, resulted in a recommended Guidelines range of 8 to 14 months' imprisonment. The court then requested argument on what the appropriate sentence should be.

8

Consistent with the plea agreement, the government requested a 14-month sentence. Taylor's attorney asked for a sentence of 10 months, arguing that the Guidelines already accounted for Taylor's criminal history and that any treatment of Taylor's previously undiagnosed psychosocial thought disorder would be most effective if he were not in custody.

Taylor then addressed the court, stating, "I just want to apologize for . . . filings in your court that, you know, were deemed frivolous. I didn't know, again, that these things were."

In imposing sentence, the court explained that it had "very carefully considered" the Guidelines range of 8 to 14 months, but found it to be "hopelessly, woefully inadequate." The court pointed out that Taylor had committed "four different bank holdups over a relatively short period of time running from December 2009 to April 2010," that he was a recidivist, and that the court had to consider protecting the public. The court observed that Taylor had earlier received a sentence of 63 months' imprisonment for a bank robbery that was a "strikingly similar" "note job" and that he had also received an additional five months in that case for violating the conditions of supervised release. Despite those sentences, the court noted, Taylor had not been deterred from pursuing his criminal conduct.

9

The court also analyzed Taylor's other criminal history, including convictions for assault on a law enforcement officer, for which Taylor received a "relatively trivial slap on the wrist," and an unlawful wounding, for which he again received a "very substantial break."

The court next considered Taylor's mental health, concluding that "to release [Taylor] to the public now, with the hope that somehow he'll do what he's never done in the past, is not something that I think would be appropriate. I believe that he needs medical care, including mental health services, in a structured environment."

Finally, the court, after observing again that Taylor had received 63 months in the Eastern District of Virginia "[f]or virtually the same offense conduct," expressed the desirability of punishing the same conduct in a uniform manner. It then imposed a variance sentence of 63 months' imprisonment.

On appeal, Taylor raises three issues, contending (1) that the government, in giving its opinion on the obstruction of justice enhancement, breached its plea agreement; (2) that the court erred by imposing an obstruction of justice enhancement, and therefore the sentence was procedurally unreasonable; and (3) that the 63-month sentence was substantively unreasonable.

10

Taylor contends first that the government breached its plea agreement not to "raise" or place "in dispute" any Guidelines factors by "arguing that Taylor's conduct constituted obstruction of justice under U.S.S.G. § 3C1.1."

The government argues that it did not violate the agreement because it did not argue for the enhancement. Alternatively, it maintains that if found to be in violation of the agreement, its conduct would nonetheless have been justified because Taylor breached his obligations when he continued with his obstructive campaign even after the plea agreement.

Because plea agreements are "rooted in contract law," "each party should receive the benefit of its bargain." United States v. Lewis, 633 F.3d 262, 269 (4th Cir. 2011) (quoting United States v. Dawson, 587 F.3d 640, 645 (4th Cir. 2009)). "It is elementary that, when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to become part of the inducement or consideration, such promise must be fulfilled." Id. (internal quotation marks omitted).

In this case, the plea agreement included a "Factual and Advisory Guidelines Stipulation" by which Taylor and the government agreed to a set of applicable Guidelines factors, which did not include an enhancement for obstruction of justice. The parties also agreed that "[n]o other offense

11

characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines or in 18 U.S.C. § 3553(a) <u>will be raised or are in dispute</u>." (Emphasis added). Taylor contends that the government breached this agreement when the AUSA told the court, in response to the court's question, that Taylor's conduct qualified for the obstruction of justice enhancement. The exchange with the AUSA was as follows:

> THE COURT: I understand the government has an agreement and is bound by it. But I'm asking you as an officer of the court whether you believe what I've described does or does not constitute obstruction of justice for an enhancement of an offense level.
>
> *   *   *
>
> AUSA: Certainly with respect to the filings that were submitted after the guilty plea. We would have serious concerns about that . . . given that by that time as I understand it the Public Defenders office was in the case and yet the filings continued. I think as a legal matter the filings do qualify for the obstruction of justice enhancement, <u>but as a contractual matter we are not seeking that and I want to make that clear on the record</u>.

(Emphasis added). When Taylor's counsel protested that the AUSA was standing in for the assigned AUSA and was not familiar with the documents he was discussing, the court responded:

> THE COURT: I've directed him as an officer of the Court to give me a legal opinion answer, and he's clearly indicated that he is standing by the plea agreement. He is not in violation of the plea agreement. He's an officer of the court. He's obligated to answer me when I ask him a question.

12

We agree with Taylor that inadvertent prosecutorial conduct can breach a plea agreement, see United States v. Peglera, 33 F.3d 412, 415 (4th Cir. 1994), as can conduct taken in complying with the directive of the court, see United States v. Keller, 422 F. App'x 273, 275 (4th Cir. 2011) (per curiam). But the plea agreement in this case required that the government not "raise" an enhancement, nor place one "in dispute." The government did neither; it did not argue for or even indicate its approval of or agreement with the imposition of an obstruction of justice enhancement. It simply gave the court a legal opinion in response to the court's direct request, adding quickly that it was not requesting the enhancement. This conduct did not amount to a breach of the plea agreement.

Taylor argues nonetheless that "[his] sentencing presents facts identical to those in Keller." But Keller is readily distinguishable. In Keller, the court concluded that the government had breached the plea agreement because "the AUSA specifically advocated for application of the enhancements when he commented in detail on the strength of evidence supporting the enhancements." 422 F. App'x at 275 (emphasis added). In contrast, the AUSA here did not "advocate" for the enhancement, nor did he even "comment . . . on the strength of the evidence" for one. The AUSA merely gave a direct answer to the court's request for an opinion, quickly noting that it was not

13

advocating for the type of enhancement on which it was giving an opinion.

Taylor also argues that "the government's insistence on appeal that Taylor's conduct merited a sentencing enhancement for obstruction of justice" was also a breach of the plea agreement. (Emphasis added). Again, we disagree. On appeal, the government did nothing more than defend the district court's sentence, as it was permitted to do. The district court, not being a party to the plea agreement, was free to apply the enhancement. Moreover, because the court was not bound by the agreement and was legally free to impose the obstruction of justice enhancement, the government has the right to defend the action on appeal as part of a legal sentence. See Lewis, 633 F.3d at 270 (stating that a district court "always has the authority to either accept or reject any [plea] agreement"). The plea agreement did not address such conduct taken on appeal.

Because we conclude that the government did not breach the plea agreement, we do not reach the government's alternative argument that any breach was justified because Taylor's post-plea filings were a breach of his obligations under the agreement.

14

III

Taylor next contends that the district court erred in applying an obstruction of justice enhancement under U.S.S.G. § 3C1.1 because (1) the court did not clearly find, nor did the record show, that Taylor <u>willfully</u> obstructed justice; and (2) in any event Taylor's conduct did not rise to the level necessary to constitute an obstruction of justice under § 3C1.1. He argues that these errors rendered his sentence procedurally unreasonable.

The government contends that the court's finding that Taylor's conduct was obstructive was not clearly erroneous because the filing of numerous frivolous pleadings and suits with the intent to hinder the prosecution can be obstructive conduct. It also contends that any error was, in any case, harmless because the court gave Taylor a variance sentence under 18 U.S.C. § 3553(a), which was not tied to the Guidelines.

Before considering the appropriate sentence under § 3553(a), the district court increased Taylor's Guidelines offense level by two levels for obstruction of justice, pursuant to § 3C1.1. That section provides, among other things, for an enhancement if the defendant "<u>willfully</u> obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." (Emphasis

15

added).  Thus, the defendant must have "consciously act[ed] with the purpose of obstructing justice."  United States v. Thorson, 633 F.3d 312, 320 (4th Cir. 2011) (alteration in original) (quoting United States v. Romulus, 949 F.2d 713, 717 (4th Cir. 1991)).

Taylor argues that we "cannot be confident that the district court indeed made a factual finding that Taylor acted with a culpable state of mind" and suggests that the court instead "imputed to Taylor a state of mind described by other decisions in other cases."  But the record does not support this argument.

The court concluded multiple times that Taylor himself had acted with the requisite intent.  For example, at the sentencing hearing, the court described the deliberateness of Taylor's "efforts outside of this case [in filing frivolous lawsuits] to interfere with [this case]."  The court then described the deliberateness of Taylor's efforts inside the case to interfere, noting, "there are consequences to taking actions designed to thwart the court system and the proper administration of justice."  Finally, the court concluded that "this is clearly a case in which there's been a systematic effort [by Taylor] to thwart this prosecution."

Although the court did recognize the increasing use of the "flesh and blood" defense generally and the consequent problems

16

it is creating for the justice system, the court did not impute to Taylor a state of mind derived from those other cases. After making its observation about the rise of the "flesh and blood" defense generally, the court turned to the facts of this case and concluded that "this is clearly a case" with the requisite intent. (Emphasis added).

Taylor also contends that the record does not show that he willfully obstructed or impeded the administration of justice. He argues that, to the contrary, the record shows that he believed that the "flesh and blood" defense was a valid legal defense or even that his action was the product of a mental disease or defect. The district court rejected this claim. The court found that Taylor deliberately used the defense to "thwart" the court system and, in particular, his prosecution. Based on the record, we cannot conclude that the court's finding was clearly erroneous.

Finally, Taylor claims that "mounting a 'flesh and blood' type of defense is not the kind of conduct that merits a sentencing enhancement under § 3C1.1." While it is true that Taylor's conduct is not identified in the "Examples of Covered Conduct" in the Commentary to § 3C1.1, the Commentary makes clear that the examples given are "a non-exhaustive list." Moreover, "the courts of appeals have applied [§ 3C1.1] to a

17

variety of misconduct" beyond the examples given.  United States v. Ashers, 968 F.2d 411, 413 (4th Cir. 1992).

In this case, the district court warned Taylor in open court about the consequences of his defense strategy:

> [I]f you are found guilty and the time comes for sentencing, I want you to know that under our sentencing guidelines, if I conclude that you've taken steps to obstruct justice, that that could enhance the amount of sentence you might be recommended for under those guidelines.

And the court warned Taylor again when it told him that "I'll be very patient with you, but I want to make sure you understand that when and if you're found guilty, if that happens, and you're presumed to be innocent, that that could affect your sentence potentially."

Despite these warnings, Taylor continued to file groundless motions.  And at sentencing, the court found:

> [T]his is clearly a case in which there's been a systematic effort to thwart this prosecution, both by actions internal to the case with the pleadings that I have summarized previously, as well as frivolous suits that were consistently dismissed by this court after a considerable amount of effort by staff of this court and by this judge to deal with it.

It found further that Taylor had "run roughshod over the court system" by filing a flood of motions and "14 civil suits . . . all of which have been found to be frivolous and dismissed."

We conclude that the district court's factual findings are not clearly erroneous, and we agree with the court that the

18

disruptive conduct, resulting in the expenditure of administrative and judicial time and expense, was sufficiently obstructive to warrant the enhancement under § 3C1.1. Accordingly, we reject Taylor's argument that the court's application of the enhancement rendered Taylor's sentence procedurally unreasonable. We therefore do not reach the government's argument on harmless error.

IV

Finally, Taylor challenges his sentence as substantively unreasonable, arguing that "the court gave more weight to certain of the § 3553(a) factors than was due, and failed to make an individualized assessment based on the facts of the present case."

Taylor pleaded guilty to four counts of bank larceny, in violation of 18 U.S.C. § 2113(a), and convictions under that statute are punishable by a maximum sentence of 20 years' imprisonment for each conviction. The government and Taylor stipulated that the Sentencing Guidelines provide a base offense level for these offenses of 7, pursuant to U.S.S.G. § 2B1.1(a)(1). The district court then increased the offense level to 9 with application of the obstruction of justice enhancement, under § 3C1.1. Based on Taylor's criminal history Category III, the recommended Guidelines sentencing range was

19

therefore 8 to 14 months' imprisonment.  If the Guidelines for bank robbery, U.S.S.G. § 2B3.1, had been applied, the analogous Guidelines sentencing range would have been 63 to 78 months' imprisonment.

After recognizing the applicable Guidelines range of 8 to 14 months' imprisonment, the court observed that a sentence within that range for four bank heists was "hopelessly, woefully inadequate to provide punishment that is sufficient to take into account all of the factors in Section 3553."  The court then conducted a systematic analysis of the relevant factors under § 3553(a) and determined that it was necessary to impose a variance sentence of 63 months' imprisonment.

Among other § 3553(a) factors, the court considered (1) the seriousness of the crime -- "four bank holdups over a relatively short amount of time"; (2) Taylor's criminal history, which included a bank robbery in Virginia that had a "striking similarity" to the holdups here; (3) the leniency of Taylor's past sentences and Taylor's failure to be deterred, including Taylor's violation of his supervised release conditions for his prior bank robbery conviction; (4) the need to protect the public; and (5) the need to avoid unwarranted sentencing disparities because Taylor had been prosecuted, albeit for robbery, for "virtually the same offense" in the Eastern District of Virginia and received a 63-month sentence.

20

We review every sentence "'under a deferential abuse-of-discretion standard,' regardless of whether the sentence imposed is 'inside, just outside, or significantly outside the Guidelines range,'" United States v. Evans, 526 F.3d 155, 161 (4th Cir. 2008) (quoting Gall v. United States, 552 U.S. 38, 41 (2007)), and determine whether it was reasonable based on "the totality of the circumstances," id. at 164 (quoting Gall, 552 U.S. at 51).

Taylor makes three points to argue that his sentence was unreasonable. He argues that the § 3553(a) analysis was flawed in that: (1) the court did not make an individualized assessment because it imposed a sentence equal to his prior sentence for robbery; (2) it gave excessive weight to Taylor's criminal history; and (3) it improperly weighed Taylor's mental health in calculating the sentence.

As to the first point, Taylor asserts that his sentence was based on an "improper analogy to a prior dissimilar offense" because Taylor's prior conviction was for bank robbery and here he pled guilty to bank larceny. The district court, however, was following the Supreme Court's direction to "maintain[] a strong connection between the sentence imposed and the offender's real conduct." United States v. Tucker, 473 F.3d 556, 564 (4th Cir. 2007) (alteration in original) (emphasis added) (quoting United States v. Booker, 543 U.S. 220, 246

21

(2005)). In explaining why it believed that 14 months was an inadequate sentence for four bank heists, the court pointed to, among other things, the 63-month sentence that the district court had given Taylor "for virtually the same offense conduct." This is not a case like United States v. Allen, 488 F.3d 1244, 1260 (10th Cir. 2007), where the court sentenced the defendant "for an entirely different, and far more serious, crime." Rather, as the court concluded in this case, the facts of the offense at issue and the facts in Taylor's past robbery were virtually the same. We conclude that the district court did not err when considering "the nature and circumstances of the offense," 18 U.S.C. § 3553(a), and analogizing this case to the earlier case.

Taylor's second point is that the court "emphasized Taylor's prior [criminal] history, to the exclusion of other factors." But this claim is simply not supported by the record. As described above, the court carefully walked through numerous relevant § 3553(a) factors and properly considered Taylor's criminal history as one among many of those factors that influenced it. Taylor also argues on this point that "the Guidelines already account for [his] criminal history." While it is true that the Guidelines take into account a defendant's criminal history, § 3553(a) allows a district court to consider a defendant's criminal history in making the determination of a

22

variance sentence. We therefore conclude that the district court did not err in considering Taylor's criminal history when determining the appropriate sentence under § 3553(a).

Finally, Taylor argues that the court "did not sufficiently consider the need to provide Taylor with medical care in the most effective manner, and misunderstood the deterrent effect that medical treatment would have." The sentencing transcript, however, shows to the contrary -- that the district court knew about and carefully considered Taylor's psychosocial disorder diagnosis. On this point, Taylor also claims that the court impermissibly considered rehabilitation, in violation of the proscription of the Sentencing Reform Act that "a court may not impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation." Tapia v. United States, 131 S. Ct. 2382, 2393 (2011). The record, again, belies the argument. The record shows that the court did not determine the length of an appropriate sentence based on a need for treatment. To the contrary, it declined to shorten Taylor's sentence based on his asserted mental health needs. It simply and permissibly expressed its hope that Taylor would take advantage of mental health services while incarcerated. "A court commits no error by discussing the opportunities for rehabilitation within prison

or the benefits of specific treatment or training programs").
Id. at 2392.

* * *

For the foregoing reasons, we affirm Taylor's sentence.

AFFIRMED