Affirmed by published opinion. Judge NIEMEYER wrote the majority opinion, in which Judge MOTZ joined. Judge GREGORY wrote a dissenting opinion.
OPINION
NIEMEYER, Circuit Judge:
After a jury convicted Thomas Thorson on one count of conspiring to defraud the United States of tax revenue, in violation of 18 U.S.C. § 371, and on three counts of aiding and assisting in the preparation and presentation of false income tax returns, in violation of 26 U.S.C. § 7206(2), the district court sentenced him to 108 months’ imprisonment. Challenging his sentence on appeal, Thorson contends that the district court erred in (1) enhancing his sentence under U.S.S.G. § 3B1.1, as an “organizer or leader” of the tax fraud scheme; (2) enhancing his sentence under U.S.S.G. § 3C1.1, for obstruction of justice in providing falsified documents to the grand jury; and (3) imposing a sentence that did not serve the need “to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,” 18 U.S.C. § 3553(a)(6).
For the reasons that follow, we reject Thorson’s arguments challenging his sentence and affirm the judgment of the district court.
I
In 1995, Thorson and co-conspirators John Ross, Glendle Johnston, Thomas Franks, Paul Decker, and others designed a scheme to solicit others to invest in *315 partnerships to purchase and subsequently donate cemetery lots in order to benefit from tax deductions available to the partnerships. Thorson and the other co-conspirators informed potential investors that the partnership had purchased cemetery sites at a low cost; that the sites would be held for longer than one year; and that the sites would then be donated to a charity at the end of the tax year, creating tax deductions in the amount of a higher appraised value of the sites, yielding a tax benefit to partners. IRS regulations provided that if a taxpayer owned a piece of property for less than a year before making a charitable donation of the property, the deduction for the donation was limited to the purchase price of the property. But if the taxpayer held the property for more than a year and then donated it, the taxpayer could claim a stepped-up deduction for the appraised value of the property.
The partnership had trouble recruiting investors in the beginning because the investors would need to wait two years to receive the tax benefit from their investment. Thus, in order to make the investment attractive, the partnership had to devise a way by which to purchase the cemetery sites, solicit investment participation, and donate the sites to obtain a deduction, all within the period of a single calendar tax year so that the investor could claim the deduction the following April.
For the tax years 1996, 1997, and 1998, Thorson formed three separate partnerships, one for each year, that terminated at the end of the year. During the given year, various co-conspirators, but mainly Johnston, purchased cemetery sites for that year’s partnership at low prices and on December 31 of that year, donated the sites to charities (often the same entity from whom the sites were acquired). The partnership then claimed a tax deduction for the substantially higher appraised value of the site on the partnership’s tax return for the year. To satisfy the Tax Code requirement that the property be held for more than a year, Thorson fabricated documents to support a purchase date in the December before the beginning of the tax year. On the basis of the fabricated documents, the partnership was able to claim that it had held the cemetery sites for more than a year and, with that claim, was able to make the investment attractive to investors. Over the course of the three relevant years, investors paid the three partnerships more than $2.3 million for partnership interests and received $9.9 million in tax deductions.
Taking 1996 as an example, Johnston purchased cemetery sites for the 1996 partnership between March 1996 and the end of the year at a cost of $30 to $33 for each site. After the partnership donated the sites to charity on December 31, 1996, it claimed a deduction of $650 per site, the amount of the site’s claimed market value, for a total deduction of $1.8 million. To participate in the partnership’s 1996 tax deduction, investors paid the partnership a total of $494,416 for partnership interests, or 27.5% of the $1.8 million deduction. Because the cemetery sites cost a total of about $92,000, the co-conspirators realized a profit of over $400,000, representing the difference between the cost of the sites and the proceeds from selling the partnership interests to the investors. To be able to claim the deduction for tax year 1996, which was the same year that the sites were purchased, Thorson falsified the purchase documents to show that the sites had been purchased on December 23, 1995, which was more than a year before the sites were donated, on December 31, 1996. If the partnership had accurately reported when it had purchased the sites, it would have been able to claim as a deduction only the amount paid for the sites. In order to *316 receive the stepped-up deduction, the partnership would have had to hold the sites into the next tax year, making the investment in the partnership unappealing to investors, as it would have tied up their money for another year.
Similar facts were shown for the partnerships relating to tax years 1997 and 1998, although the purchase price of the cemetery sites rose each year, to a maximum of $65 per site, and the number of investors increased.
At meetings with potential investors for the sale of partnership interests, Decker was the initial spokesman for the partnership. But to respond to details and concerns about the investment, he referred comments and questions to Thorson, who was a lawyer and who had implemented the legal structure to fraudulently take advantage of the stepped-up tax deduction allowed by the Tax Code. Thorson’s participation in the enterprise was also advertised in some of the partnerships’ marketing materials, which cited his expertise in tax and non-profit law. While some investors were willing to invest after Decker had made his presentation, others did so only after consulting with and receiving assurances from Thorson.
Over the three years, 1996, 1997, and 1998, Thorson’s income from the partnership increased significantly, and he created mechanisms to conceal this income. He assigned his income from the partnerships to a corporation named AGH, Inc., which had recruited a lawyer to serve as president, but in name only. In actuality, Thor-son retained all decisionmaking authority for AGH. Under Thorson’s direction, AGH opened a Charles Schwab brokerage account, which did not have Thorson’s name associated with it, and it deposited Thorson’s income from the partnerships in the AGH Schwab account. Thorson did not report this money as income on his tax return but, instead, created paperwork suggesting that the payments to AGH were loans from a company called Mid-Atlantic Mortgage and Marketing Associates, Inc. When Thorson took money from the AGH Schwab account, he did the same. Thus, Thorson prepared a “demand promissory note” in 1998 “evidencing” a purported loan from Mid-Atlantic Mortgage to AGH and similar documents to “evidence” loans from AGH back to him. Several of these agreements were falsely dated. Consistent with this cover-up scheme, the nominal president of AGH filed a 1998 corporate tax return for AGH, reporting that AGH had received a loan from Mid-Atlantic Mortgage and had made a loan to Thorson, and therefore had no income from the transaction.
In 1998, the IRS initiated a civil audit of the 1996 partnership’s tax return, and the revenue agent made a formal request to the partnership for partnership agreements, documents related to the acquisition of cemetery sites, and partnership bank records for 1995-96. In responding to the request, Thorson prepared an index for the documents that were provided to the agent, and the documents so provided included an agreement dated December 23, 1995, purporting to evidence the partnership’s purchase of a number of cemetery sites on that date. As it turned out, however, Thorson prepared the December 23, 1995 agreement in 1998 after the IRS requested the documents. This fabrication was established not only by the document’s computer metadata, but also by contextual inconsistencies.
Even while the civil audit continued, a grand jury investigation began, and the grand jury subpoenaed various documents from the three partnerships. In response to the subpoena, Thorson produced not only the fabricated agreement dated December 23, 1995, but also another fabricat *317 ed agreement for the purchase of cemetery sites, dated December 22,1996.
Subsequently, the grand jury indicted Thorson with one count of conspiring to defraud the United States of tax revenue and three counts of filing false tax returns, and a petit jury convicted Thorson on all counts.
In sentencing Thorson, the district court accepted the pre-sentence report’s calculation of the offense level, level 21, based on the amount of loss caused by the criminal activity. The court then applied four enhancements: (1) a two-level enhancement under U.S.S.G. § 2T1.4(b)(l)(A), finding that Thorson had derived a “substantial portion of his income” from the scheme; (2) a two-level enhancement under U.S.S.G. § 2T1.4(b)(2), finding that Thor-son had engaged in sophisticated concealment; (3) a four-level enhancement under U.S.S.G. § 3B1.1, finding that Thorson was “an organizer or leader”; and (4) a two-level enhancement under U.S.S.G. § 3C1.1, finding that Thorson “willfully obstructed ... justice.” The resulting offense level of 31 yielded a recommended sentencing range of 108 to 135 months’ imprisonment. After considering all of the factors under 18 U.S.C. § 3553(a), the district court sentenced Thorson at the low end of the recommended range, to 108 months’ imprisonment.
On appeal, Thorson challenges the enhancement based on being an organizer or leader, the enhancement for willfully obstructing justice, and the reasonableness of his sentence because he received a sentence significantly heavier than those received by his co-conspirators and others in a purportedly similar situation.
II
For his principal argument, Thorson contends that the four-level enhancement based on his being an organizer or leader was not supported by the evidence and therefore was clearly erroneous.
Because the district court’s findings as to whether Thorson was an organizer or leader are factual in nature, we reverse only if the district court’s findings are clearly erroneous. United States v. Carter, 300 F.3d 415, 426 (4th Cir.2002). Under this standard,
If the district court’s account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous. This is so even when the district court’s findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.
Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (internal citations omitted); see also United States v. Stevenson, 396 F.3d 538, 542 (4th Cir.2005).
In finding that Thorson was a leader or organizer, the district court stated:
First, there’s no requirement that there be only one leader; and clearly, based on the testimony that I heard and the other information that’s been brought to my attention in connection with the sentencing leads me to the conclusion that Mr. Thorson was clearly a leader of this. I can recall, for example, the testimony of Mr. Decker, who described himself as a “go-fer.” But when it came to describing Mr. Thorson, he referred to him as a “closer.” Mr. Decker’s role was to go out and find gullible pigeons and bring them in. None of those pigeons *318 would have stayed inside the birds nest of this case but for Mr. Thorson, who was the person that was able to convince even people with the letters “CPA” after their name, and some people with the letters “J.D.” after their names that, yes, this was a legitimate deal.
It is [also] very clear that but for his fundamental role as an architect of a large portion of this scheme that this transaction could — these transactions could never have gone down and that he clearly was an organizer or leader.*
The Sentencing Guidelines provide that a defendant’s sentence is subject to a four-level enhancement “[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.” U.S.S.G. § 3B1.1(a). And Application Note 2 adds that the defendant need not be an organizer or leader of all of the participants involved in the criminal activity so long as he was an organizer or leader “of one or more other participants.” U.S.S.G. § 3B1.1 cmt. 2. The Application Notes also provide various factors for consideration in determining whether a defendant is an organizer or leader, such as the “nature of [the defendant’s] participation in the commission of the offense,” “the degree of participation in planning or organizing the offense,” or “the nature and scope of the illegal activity.” U.S.S.G. § 3B1.1 cmt. 4.
Thorson does not contest the fact that the conspiracy in this case involved five or more participants. Rather, he contends that the district court clearly erred in concluding, as a factual matter, that he was an organizer or leader of any of those participants.
The record, however, belies his claim. Indeed, it contains more than ample evidence to support the district court’s finding that Thorson was an organizer or leader.
First, Thorson, who was a lawyer and performed the legal work to carry out the conspiracy, drafted the paperwork, and designed how the paperwork could, when fabricated or altered, take advantage of the tax deduction. Because the crime was essentially a paper crime committed with the fabrication of documentation to show that the partnership had held the cemetery sites for more than one year when it had not, Thorson’s role was especially significant.
Second, Thorson was critical to the recruitment of investors. He provided Decker and other conspirators with instruction regarding the substance of the phony cover story to describe the investment, i.e., that existing contracts supported the necessary year-and-a-day holding period, a story that Decker in turn passed on to the investors. Indeed Decker never questioned Thorson about this claim but treated him as “the point man,” to whom even Decker went “when he had questions about” the investments. In the same vein, in meetings with potential investors, Decker held Thorson out as the “expert” to address investors’ questions and concerns. Decker invited investors to speak with Thorson, who, the evidence showed, explained the deal professionally and in plain terms to convince them; he was referred to as the “closer.” Similarly, solicitation letters to potential investors provided, “Our attorney, Thomas Thorson, is an expert in this area and has been involved in several hundred transactions *319 over the last 30 years which involved donating real estate and oil and gas properties to charity. He has never had a problem.” There is detailed evidence in the record about how Thorson had multiple exchanges with individual investors in his effort to persuade them to invest. Indeed, evidence supports the conclusion that some investors would not have invested in a partnership were it not for Thorson’s explanations and persuasion. It was a modus operandi of the partnerships that Decker bring potential investors through the door and that Thorson thereafter persuade them to purchase a partnership interest. A letter to investors detailed this process:
The first step to get the ball rolling is for you to arrange with Jim and Steve an informal and cost-free telephone interview with Tom Thorson to see if this is worth pursuing on your behalf. He will be able to determine quickly and confidentially whether or not you qualify. If you do ... qualify, Mr. Thorson will be glad to review this unique program with your advisor at no cost to you.... After first speaking with Mr. Thorson, ... who is a very qualified legal expert in this area, if you should have any questions, please feel free to give me a call....
Another such letter states, “The legal issues relating to the form of this transaction have been monitored and will be confirmed by Thomas Thorson, Esquire of New York City, New York.” On these facts, the district court found that the illegal activity would not have been successful were it not for Thorson’s recruitment of investors.
Third, Thorson supervised and directed the collection of paperwork and supporting data necessary to document and consummate the fraudulent transactions. He gave various instructions to co-conspirators to obtain specified outside information and lists for him, and he directed them to obtain executed signature pages for the various agreements. Consistent with this role, Thorson maintained detailed files and documentation of all transactions involved in the illegal conspiracy. As the presentence report on Thorson accurately summarized,
The defendant’s authority and control over numerous aspects of the conspiracy is evidenced by his correspondence to other participants and their actions at his direction. Also, the defendant compiled documents and maintained binders containing key paperwork for each partnership including the partnership agreements, original signature pages, assignments, donation paperwork, lists of investors, and tax returns.
Foiirth and finally, when Decker learned that the IRS had initiated an audit of one of their investors, he turned to Thorson, who assured Decker not to worry — “We’ll deal with it.” And when an IRS agent contacted Decker himself, Decker immediately called Thorson to receive instruction. In short, because Thorson had prepared the paperwork, designed the legal mechanisms for claiming the fraudulent deductions, answered questions, and issued directions in implementing the fraudulent scheme, he was in fact not only an organizer, but his co-conspirators regarded him as a leader.
Thus, the district court’s findings that Thorson was the member of the conspiracy responsible for keeping the investors “inside the bird’s nest” as he was the “closer”; that he was able to persuade people to invest in the partnerships; and that “these transactions could never have gone down” without him are amply supported by the evidence. Moreover, the district court’s finding that Thorson was the architect of “a large portion of this scheme” is *320 undisputed. That fact alone would have supported the district court’s conclusion that Thorson was an organizer of the criminal activity. Because the district court addressed the relevant Guidelines factors, see United States v. Chambers, 985 F.2d 1263, 1269 (4th Cir.1993), and its account of the evidence “is [at least] plausible in light of the record viewed in its entirety,” see Anderson, 470 U.S. at 574, 105 S.Ct. 1504, we cannot find that its findings are clearly erroneous.
Ill
Thorson also challenges his sentencing enhancement under U.S.S.G. § 3C1.1 for obstruction of justice, based on his production of fabricated or backdated documents to the grand jury. He contends that he should not be punished for his production of the fabricated or backdated documents to the grand jury because the documents were already part of the offense of conviction and his production of them was required by the grand jury’s subpoena. He also contends that this enhancement is duplicative of the sentencing enhancement imposed on him under U.S.S.G. § 2T1.4(b)(2) for sophisticated concealment.
The government argues that if Thor-son’s sentence had not been enhanced for obstruction of justice, then he would have received a free pass with respect to providing false documents to the grand jury. The government referred to two fabricated purchase agreements, one created for production to the IRS during its civil investigation and subsequently produced to the grand jury and another one produced to the' grand jury. The government also referred to the spreadsheet and letters created by Thorson to show that proceeds of the fraudulent scheme were transferred to AGH, Inc., and then back to Thorson, purportedly as loans.
The district court, relying on the Seventh Circuit’s decision in United States v. Furkin, 119 F.3d 1276 (7th Cir.1997), concluded that while the fabricated documents might have been part of the conspiracy’s concealment efforts, they were also employed “to subvert the administration of justice during the investigation, prosecution and sentencing of an offense.” Id. at 1285. It accordingly adopted the recommendation of the presentence report to enhance Thorson’s sentence for obstruction of justice under U.S.S.G. § 3C1.1.
U.S.S.G. § 3C1.1 provides:
If (A) the defendant'willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant’s offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.
Application Notes to the provision provide examples of obstructive conduct, including the “producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding.” U.S.S.G. § 3C1.1 cmt. 4(c). To satisfy the requirements of this enhancement, the defendant’s obstructive conduct must have been willful, meaning that he must have “consciously act[ed] with the purpose of obstructing justice.” United States v. Romulus, 949 F.2d 713, 717 (4th Cir.1991)‘(quoting United States v. Stroud, 893 F.2d 504, 507 (2d Cir.1990)). Thus, if a document had been falsified as part of the offense of conviction but before any investigation, the defendant’s production of the falsified document in response to a subpoena would not support this enhancement, unless it were shown that the *321 falsification was “purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction.” U.S.S.G. § 3C1.1 cmt. 1.
The willfulness element is essential. Not only is it explicitly included in the language of the Guidelines, but to impose the enhancement without that element would lead to making any production of falsified documents an automatic basis for the enhancement, creating an unacceptable dilemma for a defendant. To avoid the automatic enhancement, he would have either to withhold the fabricated documents from the grand jury, which would amount to obstruction of justice by refusing to comply with the grand jury subpoena, or to produce the documents with added corrections, which would implicate his Fifth Amendment right against self incrimination. We do not read the enhancement so broadly. Rather, we conclude that the willfulness element requires that either in producing or attempting to produce fabricated documents in the course of an investigation, a defendant must consciously act with the purpose of obstructing justice.
In this case, Thorson did more than simply respond to a grand jury subpoena by producing previously falsified documents. Rather, during the civil IRS investigation of his offense, he created documents to thwart the investigation. He fabricated a December 23, 1995 agreement in response to the IRS audit, with the purpose of providing documentation to support the tax deduction. Similarly, he fabricated another purchase agreement dated December 22, 1996, and produced it, together with the fabricated December 23, 1995 agreement, to the grand jury. As the IRS audit and grand jury investigation both constituted investigations of his offense, we find no error in the district court’s application of the enhancement under U.S.S.G. § 3C1.1. See United States v. Fiore, 381 F.3d 89, 94 (2d Cir.2004) (holding that perjury during a related civil investigation constituted obstruction of justice under § 3C1.1).
Thorson argues further that the same underlying conduct gives rise to enhancements for both obstruction of justice and sophisticated concealment and that, therefore, the enhancements are duplicative. To be sure, “there is a certain amount of overlap among various factors as they relate to sophisticated means, obstruction of justice, departure, as well as the guideline for the underlying conspiracy,” but each enhancement addresses different behavior and concerns. Furkin, 119 F.3d at 1284. An enhancement for sophisticated concealment under U.S.S.G. § 2T1.4(b)(2) addresses the usual efforts of a complex criminal enterprise to conceal its wrongdoing during the course of the criminal activity. In this sense, this tax conspiracy’s widespread pattern of falsifying contracts and tax information gives rise to the sophisticated concealment enhancement. But that enhancement punishes the defendant’s past efforts to avoid detection, whereas an obstruction of justice enhancement punishes conduct carried out with the purpose of frustrating an actual investigation. While there may be some overlap, the enhancement for obstruction of justice is based on the distinct conduct focused on frustrating or impeding the investigation. Accordingly, we reject Thorson’s argument based on duplication.
IV
Finally, Thorson contends that his 108-month sentence was substantively unreasonable in that it ignored the prescribed consideration of § 3553(a)’s direction “to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.” See 18 U.S.C. § 3553(a)(6). Thor- *322 son relies on evidence presented to the district court which showed “that the average prison term for defendants who are convicted in cases involving between $2.5 million and $5 million is 46.6 months.” He was sentenced to 108 months’ imprisonment. Thorson also points to the sentences received by his co-conspirators, noting the fact that Ross received a sentence of 5 years’ probation; Johnston received a sentence of 37 months’ imprisonment; and Decker was given immunity in exchange for his testimony.
The district court, in lieu of relying on the statistics advanced by Thorson, which were drawn from other cases, noted that it was conducting an individualized assessment of Thorson’s circumstances in this case based on factors identified in the Sentencing Guidelines and in 18 U.S.C. § 3553(a), that were applicable to him. See Gall v. United States, 552 U.S. 38, 49-50, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).
The court began by properly calculating the recommended Sentencing Guidelines range, concluding that the recommended range was a sentence of 108 to 235 months’ imprisonment. The court then considered the § 3553(a) factors in extensive detail, revealing its thinking as to each factor. The court explained why it rejected a variant sentence, as requested by Thorson, and imposed a sentence within the recommended Guidelines range, concluding that such a sentence would best serve the relevant sentencing purposes. The court stated:
I consider this to be a tragedy for Mr. Thorson and his family, but it is also a tragedy for the legal profession. Mr. Thorson is a disgrace to the legal profession. There are those who take then-law degree and use it in the best traditions of this profession ... for promotion of good and the advancement of client’s interest[s] and the legitimate practice of law, and there are those who take that special training and use it not for good but for evil.
In this case, Mr. Thorson is not just a consigliere in the context of the godfather, but he was a significant leader of this enterprise. Indeed, as described by one of the co-conspirators, a closer.... [H]e was consistent in his deceptive manner. He was consistent in deceiving everybody, including the grand jury. He doctored documents, thumbed his nose at the Internal Revenue Code, and it is an extremely serious offense and one that deserves punishment.
The history and characteristics of the defendant do not, in my judgment, indicate that there should be substantial leniency. He has — as I’ve mentioned already, part of his history is obtaining a law degree, which he has used to further a criminal enterprise. It’s understandable that he’s a nice man, that he has a lovely wife, good children, went to church, but I cannot disregard the essential conduct in which he engaged and, accordingly, I conclude that there’s little basis or reason why there should be leniency under those circumstances.
... Sometimes people think that a little old tax cheating is not a big deal. It is. Especially when it involves as much sophistication and devices as were concocted by this defendant and his coconspirators in order to cheat [the] Internal Revenue Service out of tax moneys to which it was entitled.
* * *
And as I’ve already indicated, in light of the seriousness of this offense and the need to deter others from engaging in fraudulent tax shelter schemes of this nature, a sentence of incarceration — a significant one — is required.
*323 Addressing specifically the need to avoid unwarranted sentencing disparities, which is at the heart of Thorson’s sentencing challenge, the court stated:
I’m required to consider the need to avoid unwarranted sentence disparities among defendants with similar records that have been found guilty of similar conduct. I have considered the information provided to me by counsel for the defense. It is largely based upon the amount of the loss. It utterly fails to take into account all of the various variables that are before me, including the level of sophistication involved in this enterprise, the concealment, the obstruction of justice; so I find that to be of little help. What is more help to me is the application of the sentencing guidelines, which carefully consider all of these various factors and apply an appropriate offense level adjustment based on each one of those, all of which are designed with the goal of promoting a uniform system of sentencing.
I, therefore, conclude that a sentence within the guidelines system is appropriate, does promote uniformity, and will fairly emulate all of the factors set forth in Section 3553.
After considering the § 3553(a) factors and addressing each one, the district court exercised its discretion to impose a sentence within the Sentencing Guidelines range and at the low end, finding that in doing so, it was accomplishing the Guidelines system’s goal of uniformity.
We find no error or abuse of discretion in the sentence imposed. A sentence within the properly calculated Guidelines range is presumptively reasonable, see United States v. Raby, 575 F.3d 376, 381 (4th Cir.2009); see also Rita v. United States, 551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007) (authorizing appellate courts to presume that a sentence within the Guidelines range is reasonable), and Thorson has fallen short in his efforts to demonstrate otherwise.
For the reasons given, we affirm the judgment of the district court.

AFFIRMED.

 Thorson argues that the district court misconstrued Decker’s testimony in making this statement, because Decker referred to Johnston, and not himself, as a "go-fer.” This slip, however, was not material, as the district court accurately noted that Decker did, in fact, refer to Thorson as a "closer.”