**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1252

MARTY WALSH, Secretary of Labor, United States Department of Labor,

Plaintiff - Appellee,

v.

ADAM VINOSKEY; THE ADAM VINOSKEY TRUST,

Defendants - Appellants,

and

EVOLVE BANK & TRUST; MICHAEL NEW; SENTRY EQUIPMENT ERECTORS, INC.; THE SENTRY EQUIPMENT ERECTORS, INC. EMPLOYEE STOCK OWNERSHIP AND SAVINGS PLAN,

Defendants.

------------------------------

KIM BLAUGHER, Executive Director of the Beyster Institute at the University of California San Diego's Rady School of Management; AMERICAN SOCIETY OF APPRAISERS,

Amici Supporting Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg. Norman K. Moon, Senior District Judge. (6:16-cv-00062-NKM-RSB)

Argued: September 22, 2021                    Decided: December 6, 2021

Before NIEMEYER, DIAZ, and QUATTLEBAUM, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Niemeyer and Judge Diaz joined.

_____

**ARGUED:** Lars Calvin Golumbic, GROOM LAW GROUP, CHARTERED, Washington, D.C., for Appellants. Stephen Silverman, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee. **ON BRIEF:** Kate S. O'Scannlain, Solicitor of Labor, G. William Scott, Associate Solicitor for Plan Benefits Security, Jeffrey Hahn, Litigation Counsel, Stephanie Bitto, B.A. Schaaf, Plan Benefits Security Division, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee. Bennett L. Cohen, Denver, Colorado, Robert D. Grossman, Kansas City, Missouri, Gregory K. Brown, Christopher K. Buch, POLSINELLI PC, Chicago, Illinois; Mitchell G. Miller, Solana Beach, California, for Amicus Kim Blaugher. Lynn E. Calkins, Washington, D.C., Louis L. Joseph, Chelsea A. McCarthy, William F. Farley, HOLLAND & KNIGHT LLP, Chicago, Illinois, for Amicus American Society of Appraisers.

_____

QUATTLEBAUM, Circuit Judge:

The Employee Retirement Income Security Act of 1974 (ERISA) prohibits any fiduciary of an employee benefit plan from causing the plan to engage in transactions with a "party in interest" when the party in interest receives more than fair market value. A fiduciary who violates this prohibition is liable for the resulting losses to the plan. Further, a non-fiduciary who "knowingly participates" in the fiduciary's breach is also liable for such losses. The question for us in this appeal is whether the district court, after conducting a bench trial, erred in imposing liability and calculating damages against an alleged knowing participant in a fiduciary's ERISA breach. For the reasons discussed below, the district court did not clearly err in its liability findings. However, we reject the district court's legal conclusion concerning the damages award. Thus, we affirm in part and reverse in part.

I.

A.

With only a high school diploma and some practical experience from the military and later working in the beverage industry, Adam Vinoskey in 1980 founded Sentry Equipment Erectors, Inc. Sentry primarily supplies equipment to soft drink manufacturers. He and his wife, Carole Vinoskey, originally owned 90% of the company.

Since "day one" of Sentry, Vinoskey hoped and planned for Sentry's employees to eventually own the company. *See* J.A. 353. To accomplish that, in 1993, Sentry formed an

3

employee stock ownership plan (ESOP).[1] Sentry then periodically contributed to the ESOP. Those contributions were in turn used to purchase shares of Sentry stock. By 2004, the ESOP owned 48% of Sentry, with the Vinoskeys owning the remaining 52% through the Adam Vinoskey Trust they had since formed. Along with his role as president and chief executive officer of Sentry and chair of its board, Vinoskey served as one of the trustees to the ESOP.

Around 2010, Vinoskey expressed his interest to sell the Vinoskeys' remaining shares to the ESOP. But in such a sale Vinoskey would be on both sides of the transaction— as a seller of the Vinoskeys' remaining shares and as a buyer since he was one of the ESOP's trustees. To avoid a conflict of interest, Sentry entered into an agreement with Evolve Bank and Trust, in which Evolve would serve as the ESOP's independent fiduciary to review the transaction. To put it differently, Evolve would represent the ESOP during Vinoskey's sale of shares to the ESOP.

Ultimately, the ESOP purchased the rest of the Vinoskeys' stock for $20,706,000. That purchase price represented a price of $406 per share of Sentry stock. Of the $20,706,000 payment, the ESOP paid the Vinoskeys $10,400,096 in cash and executed an

---

[1] The first known ESOP dates back to 1956, when lawyer and economist Louis O. Kelso enabled the employees of Peninsula Newspapers to buy out the company's founders, with the help of Louisiana Senator Russell Long who developed a tax policy that could account for an employee's ownership of the company under ERISA. Senator Long recalled this development as "one of his most important accomplishments." John H. Cushman Jr., *Russell B. Long, 84, Senator Who Influenced Tax Laws*, *N.Y. Times*, May 11, 2003 (§ 1), at 40. As of the date of this opinion, the largest ESOP-owned company is Publix Super Markets—arguably most famous for their deli sandwiches, or "Pub Subs." *See* Leah M. Omilion-Hodges & Jennifer K. Ptacek, *Leadership in Different Organizations and Sectors*, *in Leader-Member Exchange and Organizational Communication* 99, 112 (2021).

interest-bearing promissory note to him in the amount of $10,305,904. Four years later, Vinoskey, presumably as trustee for the Adam Vinoskey Trust, forgave $4,639,467 of the ESOP's outstanding debt.

B.

The Secretary of the United States Department of Labor sued Evolve and Vinoskey,[2] claiming the ESOP's purchase of Vinoskey's remaining Sentry stock was a prohibited transaction under ERISA as Vinoskey was a party in interest and the purchase price exceeded the fair market value. It sought to recover the ESOP's losses—the difference between the actual fair market value of the shares and the amount paid by the ESOP. After discovery, the district court conducted a bench trial. The district court concluded that Evolve's due diligence for the transaction, despite its status as a fiduciary, was "rushed and cursory" and involved numerous failings. *See Pizzella v. Vinoskey*, 409 F. Supp. 3d 473, 505, 511–25 (W.D. Va. 2019). It found that the fair market value of Sentry's stock was $278.50 per share, not $406 per share. Therefore, according to the district court, Evolve was liable for making the ESOP purchase Vinoskey's stock at a price above fair market value. *See id.* at 511, 525, 540. The district court found Evolve liable under ERISA Section 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A), (D), for causing a prohibited sale of property to a party in interest. It also found Evolve liable under ERISA Section 404(a)(1)(A) and (B), *id.* § 1104(a)(1)(A), (B), for violating its own fiduciary duties of prudence and loyalty to the ESOP. *See Vinoskey*, 409 F. Supp. 3d at 541–42.

---

[2] The Secretary actually sued Vinoskey personally and the Adam Vinoskey Trust. For convenience purposes, we will refer to both defendants collectively as Vinoskey.

In addition, the district court found Vinoskey liable for the ESOP's losses under ERISA Section 405(a)(1) and (3), 29 U.S.C. § 1105(a)(1), (3), as a "co-fiduciary" for Evolve's fiduciary breaches. *See Vinoskey*, 409 F. Supp. 3d at 529–30. It also found Vinoskey liable under ERISA Section 502(a)(5), 29 U.S.C. § 1132(a)(5), as a "knowing participant" in a prohibited transaction. *See Vinoskey*, 409 F. Supp. 3d at 526–29.

As such, the district court found Vinoskey jointly and severally liable with Evolve for $6,502,500 in damages. This amount is the difference between the per-share stock price of $406 (the price Vinoskey received) and $278.50 (the stock's fair market value as determined by the district court) times the 51,000 shares sold. *See id.* at 540.

Evolve and Vinoskey moved for a reduction in the damages award by $4.6 million, which was approximately the amount of debt that Vinoskey forgave in 2014—$4,639,467. The district court did not reduce the damages, but only because it considered itself to be "constrained by the weight of authority disfavoring any reduction of damages by the amount of subsequent debt forgiveness." *Id.* at 541 n.31. In fact, the district court "note[d] that it would otherwise be disposed to do so." *Id.*

Evolve and Vinoskey separately appealed, and we consolidated the two cases. Evolve eventually settled with the Secretary and moved to dismiss its appeal, which we granted pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure. Vinoskey's appeal continues, and we have jurisdiction to hear it under 28 U.S.C. § 1291.

II.

Before turning to Vinoskey's arguments on appeal, we address our standard of review. "Following a bench trial, we review a district court's factual findings for clear error and its legal conclusions de novo." *Brundle ex rel. Constellis v. Wilmington Tr., N.A.*, 919 F.3d 763, 773 (4th Cir. 2019) (citing *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502 (4th Cir. 2016)). Our review of an award of damages depends on the nature of the findings and conclusions. We review the conclusions of law regarding the availability and calculation of damages de novo, but the factual findings relating to the calculation of damages for clear error. *Simms v. United States*, 839 F.3d 364, 368 (4th Cir. 2016).

"Clear error" is a "very deferential standard of review." *United States v. Horton*, 693 F.3d 463, 474 (4th Cir. 2012). A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *HSBC Bank USA v. F & M Bank N. Virginia*, 246 F.3d 335, 338 (4th Cir. 2001) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). For clear error review, our inquiry is not whether we would have reached the same result if we were sitting in the district court's shoes. Rather, we review "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety." *United States v. Thorson*, 633 F.3d 312, 317 (4th Cir. 2011) (quoting *Anderson*, 470 U.S. at 573–74). If so, we may not reverse the district court's conclusion—even if we may have weighed the evidence differently. This is the case "even when the district court's findings do not rest on credibility determinations but are based

instead on physical or documentary evidence or inferences from other facts." *Id.* (quoting *Anderson*, 470 U.S. at 574).

## III.

With our standard of review in mind, we turn to Vinoskey's arguments on appeal. Vinoskey contends both theories under which he was held liable (either as a co-fiduciary or knowing participant) required that he knew or should have known the $406 per-share sales price was greater than the fair market value of the stock. While he raises other arguments pertinent to each theory of liability, Vinoskey argues the district court's holding that he knew or should have known the sales price was greater than fair market value was clearly erroneous. He also argues that the district court's refusal to reduce its damages award by $4.6 million—the approximate amount by which Vinoskey reduced the debt portion of the purchase price—was incorrect as a matter of law.

## A.

## 1.

We begin with the district court's finding that Vinoskey was liable as a knowing participant in an improper transaction under Section 502(a)(5) of ERISA. Under that provision, the Secretary of Labor may initiate a civil action "to enjoin any act or practice which violates any provision of this subchapter," or "to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter." 29 U.S.C. § 1132(a)(5). The Supreme Court has interpreted this provision to mean that "the Secretary may bring a civil action under § 502(a)(5) against an 'other person' who

'knowing[ly] participat[es]' in a fiduciary's violation." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 248 (2000) (alterations in original).

But what exactly does it mean to knowingly participate in a fiduciary's violation? The Supreme Court in *Harris Trust* explained that the non-fiduciary must have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Id.* at 251. This language provides us with two insights. On one hand, the "other person" does not have to know that the transaction was unlawful under ERISA. Nothing in *Harris Trust* suggests the non-fiduciary must possess knowledge of legal conclusions. On the other hand, general knowledge of the transaction's circumstances is not enough. The "other person" must know the circumstances *that rendered the transaction unlawful*.

The circumstances that made the transaction here unlawful are straightforward—Evolve, as a fiduciary, caused the ESOP to purchase Sentry stock from a party in interest for more than fair market value. *See* 29 U.S.C. §§ 1106(a)(1)(A), 1108(e)(1) (prohibiting an ERISA fiduciary from causing an ESOP to engage in a transaction except for certain exceptions, one of them being a sale with "adequate consideration"). Vinoskey only disputes his knowledge that the price of the Sentry stock was in excess of fair market value. Thus, we turn to the district court's decision on that issue.

2.

The district court found that Vinoskey actually knew that the $406 per-share price exceeded the fair market value of Sentry's per-share price. In reaching this conclusion, the district court relied on multiple pieces of circumstantial evidence indicating that Vinoskey reviewed the stock prices from 2004 to 2009, which ranged from $220 to $285 per share.

9

*See Vinoskey*, 409 F. Supp. 3d at 527. Since those values are significantly below the $406 per-share value, the district court concluded Vinoskey should have been aware that the price offered was greater than the per-share fair market value of Sentry. In addition, the district court noted that witnesses testified that Vinoskey "understood the general approach" of the stock appraisals because he discussed it from time to time, specifically concerning the importance of cash flow and earnings in the valuation process. *Id.* at 510.

At trial, there was a dispute whether Vinoskey reviewed the appraisal accompanying the $406 per-share offer presented in 2010. Vinoskey denied reviewing the appraisal in his trial testimony. However, Vinoskey testified differently during his deposition. There he stated that he reviewed the offer evaluation and Sentry's financials prior to closing. The district court found the deposition record more credible because, at trial, Vinoskey admitted it was "possible" he reviewed it and "that his memory was '[m]uch better' at the time of his deposition." *See id.* at 510–11 (alteration in original) (quoting J.A. 379, 390).

The district court also relied on evidence of Vinoskey's meeting with Evolve when it visited the Sentry plant. In this meeting, Vinoskey and Evolve discussed various information about Sentry, such as the board structure, employment agreements, compensation plan for key management, pension expenses, future performance of the company, environmental issues, offers to purchase the company, growth potentials, employee turnover rates and outstanding litigation. Vinoskey also testified he discussed healthcare expenses at the meeting—he refused to have employees pay part of the expenses (a change from what Sentry had been doing), even though Evolve suggested otherwise.

10

Based on the evidence concerning the meeting, the district court concluded the following:

> Adam Vinoskey participated fully in the November 18, 2010 meeting . . . . While present at the meeting, Adam Vinoskey would have heard multiple pieces of information that would have been relevant to how he later perceived [the] 2010 Transaction appraisal and the $406.00 per share stock price, including Connor's [Sentry's future president] statement that 2011 would be a more difficult year than 2010, Connor's discussion of the lack of growth in the soft drink industry, and Carole Vinoskey's statement that Sentry had never received a formal offer to purchase the company.

*Id.* at 510.

Thus, the district court relied on four pieces of circumstantial evidence to find that Vinoskey actually knew that $406 per share was greater than the fair market per-share value. First, Vinoskey reviewed the appraisal behind the $406 per-share price and Sentry's financials before accepting the offer in the 2010 transaction. Second, Vinoskey had reviewed the stock price in prior appraisals, understood the general evaluation methodology and knew that from 2004 to 2009 the stock price ranged from $220 to $285 per share. Third, Vinoskey had reviewed Sentry's financials on a regular basis and understood the fundamentals such as Sentry's working capital and earnings. And fourth, Vinoskey knew that selling his shares to the ESOP did not mean he would lose all control of the company. *See id.* at 527–28.

Vinoskey argues that he did not know Evolve's offer price was above fair market value. And there is certainly evidence to support his position. To start, it is apparent that evaluating a non-public company's worth is an intrinsically complex matter, and even experts disagree on fundamental methodologies. To expect Vinoskey, a high school

11

graduate with no formal training in economics or accounting, to fully understand the intricacies of valuation principles just because he was the owner of Sentry may be unfair. Operating a business, even one that appears to have been as successful as Sentry, does not automatically translate into expertise in such a specialized field.

Aside from his expertise (or lack thereof) in valuations, Vinoskey testified that he always thought the past $220 to $285 per-share valuations were too low based on his "own way of figuring numbers." *See* J.A. 350–51, 356, 1276. And he never contested the $220 to $285 price range for the same reason he did not raise eyebrows over the $406 figure either—he always deferred to the appraisers' final valuation:

> Mine probably don't agree with Brian's [the appraiser] or a lot of people's [valuation]. I -- but I didn't question how he -- I didn't question his numbers because they -- they have a -- they have -- that's their job. If I want a plumber, I call a plumber. I don't do the plumbing jobs. If I want an electrician, I call a[n] electrician. Brian Napier is the guy I call for stock. And if he tells me this is the number, this is the number.

*Id.* at 351.

Vinoskey testified he thought the value of Sentry was around $40 million. According to Vinoskey, he certainly thought he could sell his remaining shares for more than the $20,706,000 sales price from the 2010 transaction. *See id.* at 1251 ("I could have sold it for a whole lot more than what they paid for it, but that never -- that wasn't an issue, never been an issue."). In explaining why he thought the value of the company was more than $20,706,000, he reasoned that the company grew a lot, had "a lot of money" and everything was paid for. *See id.* at 395. Whether or not the $406 per-share price valuation was correct, Vinoskey insists he did not think it was too high.

12

Vinoskey also testified that selling the remaining 52% of the company, and thus giving the ESOP 100% ownership, justified a premium price. Whether the premium was justifiable is debatable. Even though the ESOP now owns all of Sentry's stock, the ESOP participants' direct voting rights were limited, and a significant number of the ESOP's actions were delegated to its trustees, one of whom was Vinoskey. But the ESOP participants' direct voting rights still existed in "certain important corporate matters." *Id.* at 1286 ("Generally, the shares of Company Stock held by the Plan will be voted by the Trustee. However, in certain limited but important corporate matters, such as a sale of all the Company's assets or merger of the Company, you will have the right to instruct the Plan Trustee . . . ." (underline in original removed)). So Vinoskey was at least ceding power in some "important corporate matters." *See id.* If ceding such authority warrants the buyer paying a premium, one can also question how Vinoskey could have known the offer price was more than the fair market value.

Finally, the record contains evidence that Vinoskey did not seek to maximize his financial well-being to the detriment of his employees. He forgave part of the ESOP's debt after the 2010 transaction when he did not have to. He testified he has "always been interested in making sure employees get a fair . . . shake of everything at Sentry." *Id.* at 349. In fact, when Evolve informed Vinoskey that the value of his shares would rise if Sentry's employees paid part of their healthcare expenses, Vinoskey refused to do so. When rejecting such propositions, Vinoskey was aware that this would be to his financial disadvantage. But he still insisted on Sentry paying for all of the employees' healthcare expenses. He explained "[t]hey think that the money's the most important thing in the

13

world, you know, ever . . . and it's not the case."[3] *Id.* at 1254. While perhaps not directly relevant to Vinoskey's knowledge of the fair market value of Sentry's stock, this evidence is inconsistent with a conclusion that Vinoskey knowingly participated in a transaction which would harm Sentry employees.

But despite this evidence supporting Vinoskey's position, we cannot conclude that the district court's finding to the contrary was clear error. *See Thorson*, 633 F.3d at 317; *see also Lewin v. Comm'r*, 335 F.3d 345, 349 n.4 (4th Cir. 2003) ("We review the district court's factual findings, including reasonable inferences that may be drawn therefrom, under the clearly erroneous standard . . . ."). This deferential standard of review binds us, and for good reason—it was the district court judge who oversaw the case from start to finish, developed the evidentiary record in the process and looked the witnesses in their eyes while they gave their testimony. In contrast, our review of the trial transcripts is at least a degree removed from the district court judge's vantage point in terms of understanding what truly happened. *Cf. Burgess v. Goldstein*, 997 F.3d 541, 555 (4th Cir. 2021) ("[T]he district court judge is in the best position to see the witnesses and is intimately familiar with the trial from a perspective this Court cannot have.").

---

[3] The district court later used Vinoskey's insistence on Sentry continuing to pay 100% of its employees' healthcare benefits cost to conclude that Vinoskey knew he was not ceding control over the company he was selling to the ESOP, which was part of the reason the district court concluded that Vinoskey knew the offer price was inflated. *See Vinoskey*, 409 F. Supp. 3d at 528. This seems unfair. A company owner's insistence that he pay 100% of his employees' healthcare costs when paying only part would be to his financial advantage hardly seems consistent with a claim that the owner is seeking more than his fair share.

And under clear error review, the district court's conclusion that Vinoskey knew the offer price was above fair market value passes muster. The district court found that Vinoskey had extensive knowledge of Sentry and its prior valuations. With an almost 40% spike in price from the assessments that he was used to seeing for the past five to six years, it is plausible to infer that he knew something was off. This is particularly so since the same appraiser that valued the stock at $406 per share in 2010 valued it at $220 to $285 per share between 2004 and 2009. After all, there had been no significant change in the company's performance. Projections also had Sentry performing more or less the same, if not slightly worse, in 2010 compared to prior years. *See* J.A. 1431 (discussing Evolve's meeting with Vinoskey, where Vinoskey heard from Sentry's future president "that next year will be more challenging than this year").

In addition, the district court's rationale for discrediting Vinoskey's own valuation of Sentry is understandable. While Vinoskey testified that third parties were eager to buy his company, Sentry never received any formal purchase offers that included prices. *Vinoskey*, 409 F. Supp. 3d at 485 (citing various trial transcripts). And even if the ESOP may have gained some additional value from its complete ownership, whether that justified a 40% premium is questionable. From our review of the record, the district court could plausibly find that Vinoskey knew the offer price exceeded the fair market value.

Possibly to overcome the district court's factual findings, Vinoskey argues that the district court's inference of what Vinoskey knew must be "obvious," not just reasonable. Opening Br. 16. To support his argument, Vinoskey cites to *Intel Corp. Investment Policy Committee v. Sulyma*, 140 S. Ct. 768, 779 (2020). But *Sulyma* merely states that "actual

15

knowledge can be proved through 'inference from circumstantial evidence,'" and that "[n]othing in this opinion forecloses any of the 'usual ways' to prove actual knowledge at any stage in the litigation." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). The only basis for characterizing *Sulyma* as precedent calling for "obvious inference" is that *Sulyma* cites to *Farmer*. Yet a closer reading of *Farmer*, an Eighth Amendment case wholly unrelated to ERISA, indicates that obviousness is merely one of the "usual ways" to infer actual knowledge from circumstantial evidence:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. . . . ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of").

511 U.S. at 842 (third and fourth alterations in original) (internal citations omitted). No part of these cases moves us to adopt a new standard in reviewing a district court's factual finding from inference.

With no legal basis that a factfinder's inference of actual knowledge must be "obvious," we lack a "definite and firm conviction that a mistake has been committed" by the district court, *HSBC Bank*, 246 F.3d at 338 (quoting *Anderson*, 470 U.S. at 573). And "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. Accordingly, we conclude the district court did not clearly err when it found that Vinoskey knew the $406 per-share offer price exceeded Sentry's fair market value.

16

3.

Guided by our standard of review, we see no clear error in the district court's finding that Vinoskey violated ERISA Section 502(a)(5). And because Section 502(a)(5) liability provides a sufficient and independent basis to affirm the district court's decision on Vinoskey's liability, we decline to address whether Vinoskey was also liable as a "co-fiduciary" for Evolve's fiduciary breaches under ERISA Section 405(a)(1) and (3), 29 U.S.C. § 1105(a)(1), (3).

B.

Having addressed Vinoskey's liability, we now turn to damages. The district court found Evolve and Vinoskey jointly and severally liable for a total of $6,502,500 to the ESOP. In reaching this decision, the district court declined to reduce the damages award by $4.6 million, which was approximately the amount of loans that Vinoskey forgave the ESOP in 2014. Interestingly, the district court commented that absent "the weight of authority," it would have offset the damages with the loan forgiveness. *Vinoskey*, 409 F. Supp. 3d at 541 n.31. By the weight of authority, the district court is referring to the Fourth Circuit decision in *Brundle*, 919 F.3d at 782, and several sister circuit cases.

The district court's prudence is much appreciated. Nevertheless, at least on the facts in front of us, the damages award could—in fact, should—be reduced by the amount Vinoskey forgave, notwithstanding *Brundle* and the decisions on which the district court relied. Those cases presented different facts where a damages reduction made little sense. Here, affirming the district court's damages award would result in an inappropriate windfall for the ESOP.

17

1.

At a cursory level, *Brundle* indeed declined to reduce the defendant's damages based on the debt that the defendant supposedly cancelled. We deemed the debt cancellation to be "wholly unrelated" to the prohibited transaction at issue, and "this independent act ha[d] no bearing on the ESOP's loss." *Id.* at 783. "Thus, in cases involving overpayment for ESOP assets, courts generally compute restitution damages exactly as the district court did here: by deducting the fair market value of the stock from the amount the ESOP actually paid." *Id.* at 782.

However, a closer reading of *Brundle* indicates that Vinoskey's position does not contradict that decision. In *Brundle*, the corporate defendant sold its stock to the company's ESOP—which the court found illegitimate—and thereafter the ESOP sold the stock to another company. Thus, primarily in dispute was whether this second sale justified reducing damages assessed to the original corporate defendant because the ESOP made a profit from the later transaction. *See id.* at 772, 779, 782. The debt cancellation was relevant only to the extent that the original corporate defendant cancelled the debt to make the second sale happen. *See id.* at 779. Important to *Brundle* was that the defendant's debt cancellation was *solely* to make a separate stock sale go through—which is why the court held that the debt cancellation was "wholly unrelated" to the illegitimate transaction when assessing damages. *See id.* at 783.

In the dispute before us, no such separate sale was consummated, nor was debt cancellation ever a bargaining chip to facilitate a different transaction. Vinoskey simply wrote off the ESOP debt. The Secretary argues that Vinoskey's debt cancellation was still

18

a "wholly unrelated" transaction because Vinoskey did this not to help the ESOP but "to assist the company to survive the downturn in soda consumption." J.A. 297. But when Vinoskey forgave the debt, the ESOP was the sole owner of Sentry. So even if Vinoskey's motives were to help the company, it is unclear how that motive is distinguishable from a desire to help the ESOP. And further accepting the Secretary's position that we must not consider any "independent act [that] has no bearing on the ESOP's loss," Resp. Br. 50 (quoting *Brundle*, 919 F.3d at 783), Vinoskey's loan forgiveness had a bearing on the ESOP's loss by reducing its debt by over $4 million. Thus, Vinoskey's debt write-off is better understood as reducing the final sale price at a later point in time given that the ESOP fully owned Sentry.

The Secretary attempts to analogize Vinoskey's loan forgiveness to another context, but the analogy fails. The Secretary argues: "If an individual sold a fake painting for $10,000, and then four years later gave the same buyer $500 as a wedding present, the seller could not later invoke the wedding present as an offset when sued for civil fraud." *Id.* at 52. But that analogy does not describe the factual situation here. The proper analogy is the following: if an individual sold a fake painting for $10,000 to be paid with $5,000 cash and a loan for $5,000, and four years later the individual cancelled the $5,000 loan, the restitution value is only $5,000 because the purchaser only paid $5,000 for the fake painting. That is exactly what happened here.

Perhaps most importantly, not offsetting the damages in this case would result in a windfall for the ESOP that is prohibited by ERISA and the cases interpreting it, including *Brundle*. "The aim of ERISA is 'to make the plaintiffs whole, but not to give them a

19

windfall.'" *Henry v. Champlain Enters.*, 445 F.3d 610, 624 (2d Cir. 2006) (Sotomayor, J.) (quoting *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000)); *accord Harms v. Cavenham Forest Indus.*, 984 F.2d 686, 693 (5th Cir. 1993) (discussing how "a double-recovery windfall" is "a result abhorred by ERISA"); *cf. Brundle*, 919 F.3d at 782 ("ERISA expressly requires a fiduciary to 'make good to [an ESOP] any losses' resulting from a given breach of duty." (alterations in original)).

In determining whether the damages award is a windfall, we assess the amount that the ESOP overpaid from the transaction. "Principles of restitution therefore entitle the ESOP and its participants to compensation for the loss from the *overpayment*." *Brundle*, 919 F.3d at 782 (emphasis in original). And applying *Brundle* to Vinoskey's no-strings-attached debt write-off, the ESOP's loss from overpayment was indeed reduced. As a result of the debt reduction, the ESOP only had to pay $16.1 million for the Sentry stock. That is still more than the $14.2 million the district court concluded that the ESOP should have paid. *See Vinoskey*, 409 F. Supp. 3d at 540. But the overpayment amount was $1.9 million, not $6.5 million. Making Vinoskey pay an additional $4.6 million would result in a windfall to the ESOP totally disconnected from any actual loss. That not only is inconsistent with ERISA; it makes no economic sense.

Last but not least, *Brundle* never adopted a sweeping ban on reducing damages by the amount of debt forgiven. *Brundle* made clear that "courts *generally* compute restitution damages" by deducting the fair market value from the actual paid price. 919 F.3d at 782 (emphasis added). Vinoskey's unconditional debt forgiveness fits into one of those

deviations from the general practice. Otherwise, the ESOP gets away with $4.6 million that it no longer needs to pay, plus an extra $4.6 million in cash from Vinoskey.

2.

While the district court and the Secretary also referenced several out-of-circuit decisions, we do not find these cases persuasive or informative based on the facts before us. First, both point to the Second Circuit's decision in *Henry v. U.S. Trust Co. of California* (*Henry II*), 569 F.3d 96 (2d Cir. 2009). A close reading of this decision makes clear that the facts are not analogous to our case. The most significant difference is that just like *Brundle*, *Henry II* also involved debt cancellation as a precondition to another stock sale. The debt cancellation in *Henry II* was in exchange for the ESOP selling the shares back to the corporation, which thus confirmed and finalized the loss. *See id.* at 97–98. As we did in *Brundle*, the Second Circuit was expressing its concern over a matter different from the kind of debt cancellation that Vinoskey provided. The court explained:

> If an investor pays $100 for 20 shares of stock and later sells those shares back to the original seller for $25, the result is not that the investor paid only $75 for the shares. Rather, the result is that the investor lost $75 on that investment. Although the transactions in the present case involved payment chiefly in the form of debt obligations and debt forgiveness, rather than cash, the fundamental logic remains the same. If the hypothetical investor above paid for the 20 shares with $100 of IOU's and later resold the shares to the original seller for a cancellation of $25 of IOU's, no one would deem the resale to have altered the original price so that no loss was incurred.

*Id.* at 100. Under the facts presented in *Henry II*, of course it makes sense to not reduce damages based on debt forgiveness—the debt cancellation did nothing to reduce the loss because the ESOP's debt cancellation also came with a loss of shares (hence the re-sale). The facts here, however, are different. Because the ESOP was not selling the Sentry stock

21

back to Vinoskey, there was a direct improvement in the ESOP's financial position, with no change to ESOP's ownership over Sentry. The cancelled debt was cancelled debt, and there is less money the ESOP must ultimately pay back to Vinoskey.

There is another meaningful difference between *Henry II* and our case. In *Henry II*, the fiduciary bank that was responsible for the stock sale was not the same defendant that cancelled the debt. *See id.* at 98. This echoes our reasoning that the debt cancellation cannot be a "wholly unrelated" transaction. *See Brundle*, 919 F.3d at 783. In contrast, here we are assessing the damages to be paid by Vinoskey, who also forgave the ESOP loans.

In addition, *Henry II*'s answer to a separate argument advanced by the defendant there buttresses our conclusion. In *Henry II*, the defendant "conten[ded] that only repayments of debt, and not the assumption of indebtedness itself, constitute a loss." 569 F.3d at 99 n.4. According to the defendant there, debt not yet paid back does not constitute a loss, and loss starts incurring only once the debtor starts paying. In rejecting this position, *Henry II* discussed how "indebtedness has immediate legal and economic consequences even before the borrower begins to repay the debt," since debt in the present constrains the borrower's plans for the future. *Id.*

The Second Circuit's reasoning makes perfect sense. Otherwise, we would be ignoring basic economic principles where loans bear real, material consequences to the debtor. But by extension, "immediate legal and economic consequences" are immediately removed once that debt is forgiven. Such removal must mean something. In sum, *Henry II*'s discussion of how indebtedness is a harm is also a reason why the relief from indebtedness is a mitigation of a harm. Since damages are the courts' way of translating

22

harm to dollar amounts, our reduction of damages is how we accurately reflect the degree of harm the ESOP suffered from the 2010 transaction.

We next discuss the Fifth Circuit decision in *Perez v. Bruister*, 823 F.3d 250 (5th Cir. 2016). *Perez* did not involve a defendant that forgave the ESOP's debt. Instead, *Perez* addressed whether a damages calculation should exclude the debt that the ESOP had not yet paid back.[4] *See id.* at 255–57, 270. This was the same argument advanced in *Henry II* that the Second Circuit rejected. In fact, the Fifth Circuit quoted *Henry II*'s "indebtedness has immediate legal and economic consequences" language. *See id.* at 271. For reasons already discussed, we find no tension between the Fifth Circuit's decision that unpaid debt must remain part of the damages calculation and our conclusion that Vinoskey's debt forgiveness should reduce his damages amount. In fact, the results apply the same economic principle: indebtedness creates immediate legal and economic harm. And consistent with that principle, if Vinoskey alleviated the ESOP's harm by lowering the debt, we must factor that in.

Thus, just as Vinoskey's request for a reduction in the damages award based on his debt forgiveness is not inconsistent with our *Brundle* decision, neither is it inconsistent with the out-of-circuit cases relied on by the Secretary and the district court. In sum, under de novo review, we reverse the district court's legal conclusion to the contrary.

---

[4] To the extent there was a "debt cancellation," it was to restructure the loans for tax purposes. "The economics of the transaction did not change—the ESOP still ultimately was indebted by the same amount . . . but BAI [the company owned by one of the defendants] was now a middleman." *Perez*, 823 F.3d at 271.

23

IV.

For the above stated reasons, we affirm the district court's Final Judgment that Vinoskey is liable for violating 29 U.S.C. § 1132(a)(5). But we reverse the district court's Final Judgment that Vinoskey is jointly and severally liable in the amount of $6,502,500, and order instead that Vinoskey is jointly and severally liable in the amount of $1,863,033. This amount is derived by subtracting the amount of the ESOP's loan that Vinoskey forgave ($4,639,467) from the district court's damages award.

*AFFIRMED IN PART AND REVERSED IN PART*